## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BENISTAR ADMIN SERVICES, INC., a Delaware Corporation, and DONALD J. TRUDEAU, an individual, Plaintiffs, v. LANCE H. WALLACH, a.k.a. "Robert Sherman," an individual, VEBA, LLC, a New York Limited Liability Company, and DATHONIE D. PINTO, an individual, Defendants. | **Civil Action No.** 17-cv-4296 <br><br> **COMPLAINT** <br> **and JURY DEMAND** |

### NATURE OF COMPLAINT

1.      This is an action based on federal trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, cybersquatting under the Anticybersquatting Consumer Protection Act, 15 U.S.C. §1125(d) *et seq.*, as well as for common-law trademark infringement, unfair competition, statutory and common law unfair business practices, and breach of contract under the laws of the State of New York. Plaintiff Benistar Admin Services, Inc. seeks monetary, injunctive, and other relief against Defendants for the reasons set forth below.

2.      Plaintiff Donald J. Trudeau also seeks damages as a result of Defendant Lance H. Wallach's and or Dathonie Pinto's defamatory statements made against him, personally.

215682724.11
216007675
216019474

## THE PARTIES

3.      Plaintiff, BENISTAR ADMIN SERVICES, INC. ("Benistar") is a corporation organized under the laws of the State of Delaware, having a principal place of business at 25 Seir Hill Road, Norwalk, Connecticut 06850.

4.      Plaintiff, DONALD J. TRUDEAU ("Trudeau") is a natural person and a citizen and resident of Greenwich, Connecticut.  Trudeau is the current President of Benistar.

5.      Defendant VEBA, LLC ("VEBA") is a New York limited liability company having a registered business address of 68 Keswick Lane, Plainview, New York 11803-6100.

6.      Defendant LANCE H. WALLACH ("Wallach") is a natural person and a citizen and resident of the State of New York, having a residential address of 68 Keswick Lane, Plainview, New York 11803-6100. Wallach is a licensed and active insurance agent in the State of New York.

7.      On information and belief, Wallach is also known as "Robert Sherman."

8.      On information and belief, Wallach is the founder and owner of VEBA. In the parlance of welfare benefit plans and insurance, V.E.B.A is a well-known acronym for "Voluntary Employee's Beneficiary Association," which is a form of a trust fund established for the purpose of providing insurance benefits to employees.

9.      Defendant DATHONIE D. PINTO ("Pinto") is a natural person and a citizen and resident of the State of New York, having a residential address of 130 Camdike Street, Valley Stream, New York 11580-5334. On information and belief, Pinto is also an affiliate and third party contractor of Wallach and VEBA.

## JURISDICTION AND VENUE

10.     This Court has original subject matter jurisdiction over Benistar's federal claims

pursuant to 28 U.S.C. §§ 1331, 1338(a), and 15 U.S.C. § 1121 because this action arises under the trademark laws of the United States, including the Lanham Act. This Court also has original subject matter jurisdiction over Benistar's claim of unfair competition pursuant to 28 U.S.C. 1338(b) because the claim is joined with a substantial and related claim under the Lanham Act.

11.    This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and because the matter  in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

12.    This Court has supplemental subject matter jurisdiction over Benistar's and Trudeau's state statutory and common law claims because those claims are so integrally related to Benistar's federal claims, over which this Court has original jurisdiction, the federal and state claims arise from a common nucleus of operative facts, and would ordinarily be expected to be tried in one judicial proceeding. Accordingly, resolution of all claims in this Court furthers judicial economy pursuant to 28 U.S.C. § 1367.

13.    This Court has both general and specific personal jurisdiction over the Defendants because: (a) they are residents of this judicial district; (b) they have regularly and systematically conducted business in this judicial district; (c) events giving rise to Plaintiffs' claims occurred in this judicial district; (d), this jurisdiction is the corporate nerve center for the limited liability company, and (e) they have otherwise purposely availed themselves of this jurisdiction.

14.    Venue for this action properly lies within this Judicial District pursuant to 28 U.S.C. § 1391(b)(1) because the Defendants are residents of the State in which this Judicial District is located. Venue for this action also properly lies within this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within it.

## ALLEGATIONS COMMON TO ALL COUNTS

**A.    Benistar Background**

15.    Incorporated in 1995, Benistar is in the business of consulting, management, and administration regarding employee healthcare benefit plans. It specializes in retiree medical and prescription drug plans. In its operation, Benistar works with brokers and consultants to provide retiree medical and prescription drug solutions to a variety of organization types, including corporations, government entities, and educational institutions.

16.    From its inception, Benistar has continually owned all common-law rights in the name and trademark "BENISTAR", for use in connection with a variety of services including, *inter alia*, consulting, management, and administration regarding employee healthcare benefit plans.

17.    Benistar is the owner of United States Trademark Registration Numbers 4,889,308 and 4,885,471, both filed in International Class 36, for a BENISTAR Word Mark and a BENISTAR Composite Mark, respectively, (both marks being collectively referred to hereinafter as the "BENISTAR Marks"). The BENISTAR Word Mark was first used in interstate commerce at least as early as June 30, 1995 and the BENISTAR Composite Mark was first used in interstate commerce at least as early as August 31, 2013. The BENISTAR Marks have been consistently used in interstate commerce since the respective first use dates and the BENISTAR Marks are currently being used in interstate commerce.

18.    Benistar is the registered owner of the domain name benistar.com, having registered the name on February 29, 1996.

19.    Benistar has invested extensive and significant amounts of time, money, and effort in developing the BENISTAR Marks throughout the United States. The BENISTAR

Marks are well-known within the healthcare insurance plan industry, and have become exclusively associated with Benistar by those familiar with the industry, as well as the public at large. Accordingly, the BENISTAR Marks have become, through widespread and favorable public acceptance and recognition, famous and an asset of substantial value as a symbol of Benistar, its services, and its goodwill.

**B.     Beginning in 1997, A 419A(f)(6) Plan History**

20.     In 1997, Benistar began administering, among other plans and services, welfare benefit plans commonly referred to as "419 plans" to customers of third party producers.

21.     A 419 plan is a funded welfare benefit that allows for employer-provided benefits covering sickness, accidents, disability, death, or unemployment. The 419A(f)(6) welfare benefit plans formerly qualified under subsection (f) item (6) of Section 419A of the Internal Revenue Code (26 U.S.C. §419A(f)(6)) which defines treatment of certain multiple-employer funded welfare benefit plans.

22.     On information and belief, from the late-1990s to the late-2000s, the Internal Revenue Service ("IRS") systematically analyzed 419A(f)(6) plans being offered in the industry, including those by several administrators of these types of plans such as those of Benistar and various of its competitors. The IRS determined in 2003 that some of the plans were being used as improper tax shelters, and thus in 2004 the IRS began to audit beneficiaries of the plans.

23.     Prior to the IRS's determination, Benistar lawfully administered and supported 419A(f)(6) welfare benefit plans as a *bona fide* solution for many customers. When the IRS determined that the plans were often abusive tax shelters and would require extensive additional disclosure and expose customers to increased scrutiny and audit risk, Benistar determined that

these were no longer a viable customer option. Benistar stopped supporting, marketing, or administering any 419A(f)(6) plans to any new customers in 2008.

24.    Notwithstanding Benistar's lawful administrative services supporting 419A(f)(6) plans before the plans were exposed to enhanced requirements by the IRS, and subsequent compliance with IRS regulations in close proximity to when the IRS made its determination.

**C.    Beginning No Later Than 2011, Wallach and VEBA Initiated Distinct Efforts to Profit from Benistar's Poor Publicity and Trade on the Goodwill of the Benistar Marks**

25.    On information and belief, Wallach and VEBA have been and are engaged in the business of providing insurance consulting services, tax consulting services related to life and health insurance (and tax implications thereof), and expert witness services. As noted above, Wallach is a licensed and active insurance agent in the State of New York, and V.E.B.A. is well-known an acronym for "Voluntary Employees' Beneficiary Association," which is a form a trust fund established for the purpose of providing insurance benefits to employees.

26.    At least as early as 2011, Wallach and VEBA sought to take advantage of certain unfavorable publicity that Benistar had been subject to due to former sales of 419 plans, regardless of the fact that Benistar's 419 plan sales were lawful. For example, Wallach and VEBA began a concerted effort to discredit and disrupt Benistar's business by creating, publishing, and perpetuating negative content on internet via various websites, blogs, and social media outlets, such as Facebook and Twitter. Additionally, Wallach and VEBA began a process of obtaining dozens of BENISTAR-formative domain names that Wallach and VEBA have ultimately used to compete with Benistar and seek to extort vast sums of money from Benistar by offering for sale the domain names to Benistar for far greater than Wallach's and VEBA's out-

of-pocket costs for registering the domains.

27.     On information and belief, beginning at least as early as 2010, Wallach and VEBA sought to garner business as insurance consultants, tax advisors, and expert witnesses by competing directly with Benistar and by systematically propagating and perpetuating Benistar's unfavorable publicity related to the sale of 419 plans via the internet and other media. To help facilitate Wallach's plan, in 2011 Wallach personally registered the domain names benistar419audits.com, benistarabuses.com, benistaraudits.com, benistarfines.com, and benistarproblems.com (collectively, "Wallach's Websites").

28.     According to whois.com, Pinto is listed as registrant name and registrant contact for benistar419audits.com, which was registered April 8, 2011; benistarabuses.com was registered April 8, 2011, and lists Perfect Privacy LLC as registrant contact and registrant name; benistarfines.com was registered April 8, 2011, with Wallach listed as registrant name and administrative contact; and benistarproblems.com was registered April 8, 2011, with Lance Wallach listed as registrant name and administrative contact.  Benisaraudits.com shows as now being "available."

29.     Benistar419audits.com has an active link "BENISTAR THE TRUTH.... CLICK HERE NOW" that when clicked, takes the person to a website titled http://www.benistar.sucks, which is now listed as "available" on whois.com.

30.     On the benistarsucks.com website, which domain name despite being available has not been taken down, is a section that states:

Sue Them

Would you like to ......Get All Your Money Back? Successfully Fight The Internal Revenue Service? Be Made Whole? Have Your Problem Resolved With The Least Amount of Aggravation? Sue the &amp;#@!....s who got you into this mess?? You should NEVER try to handle an IRS audit by yourself. You certainly can't successfully sue without expert help. You will need expert assistance for Benistar abuses, audits,

problems, lawsuits, or other issues and trouble.

Ex IRS Agents, Tax Attorneys

Call 516 938-5007 for a free consultation. Read more here

31.    The telephone number 516-938-5007 is the office telephone number for Lance Wallach.  The "read more here" link is disabled.

32.    The New York State Unified Court System website does not show Lance Wallach as a licensed New York attorney.  Nonetheless, his notice on the website invites lawsuits and potential plaintiffs to telephone his number "for a free consultation."

33.    Wallach directed or caused to be directed a visitor of some or all of these domains to a website that made prominent use of the BENISTAR Marks, included Benistar-related content created and published by Wallach, and was used to advertise Wallach's and VEBA's competing services. Wallach and VEBA also systematically created content about Benistar and advertised Wallach's and VEBA's services using social media and blogs. Also appearing on this blog is a post titled "Retirement Today by Lance Wallach," dated September 2011.

**D.    A 2014 Services Agreement Among Benistar and Defendants: Benistar's Good Faith Attempts to Curtail Defendants' Harmful Activities in a Mutual Contract; Defendants' Breach and Failure to Perform**

34.    On April 14, 2014, in an attempt to manage the disparaging statements being created and published at Wallach's websites (and elsewhere on the internet), as well as to prevent Wallach's registration of additional domain names bearing the BENISTAR Marks, Benistar, Wallach, and VEBA executed a 2014 Services Agreement.

35.    The 2014 Services Agreement set forth Wallach's and VEBA's obligations with respect to treatment of Benistar's intellectual property rights (including the BENISTAR Marks)

and information about Benistar being published and disseminated at Wallach's Websites. Specifically, applicable Sections of the 2014 Services Agreement provided:

    5.    INTELLECTUAL PROPERTY RIGHTS

    5.3    [VEBA has] no right or license to use [Benistar's] trademarks, service marks, trade names…logos, symbols or brand names.

    9.    OTHER BUSINESS ACTIVITIES; ADVERSE POSITIONS.

    During the Term, [VEBA] may be engaged or employed in any other business, trade, profession or other activity provided [VEBA does] not actively seek any business which, to [VEBA's] knowledge, will place [VEBA] in a conflict of interest with [Benistar]…

    10.    EMPLOYEE NON-SOLICITATION; NON-DISPARAGEMENT

    …during the Term and at all times thereafter, [VEBA] will not disparage or make any negative statements concerning [Benistar] or any of its shareholders, directors, officers, employees, products or services.

    SCHEDULE 1: SERVICES and FEES

    1.    Lance Wallach ("Wallach") shall directly, or through an appropriate designated and agreed upon third party, remove or cause to be removed all negative comments on the internet, websites, social websites and the like…which specifically refer to Benistar that are within Wallach's control.

36.    The 2014 Services Agreement also contains acknowledgements and agreements by Wallach and VEBA concerning Benistar's right to terminate the 2014 Services Agreement. These applicable Sections of the 2014 Services Agreement provide:

    8.    TERMINATION

    8.1    [Benistar] may terminate this Agreement without cause upon 30 days written notice to [VEBA].

    8.2    [Benistar] may terminate this Agreement, effective upon

> written notice to [VEBA], in the event that [VEBA] breach[es] this Agreement and such breach is incapable of cure, or with respect to a breach capable of cure, [VEBA] do[es] not cure such breach within 20 days after receipt of written notice of such breach.

37.    The 2014 Services Agreement also authorized Wallach and VEBA to hire "Approved Third Party Contractors" including Pinto, in order to assist with performing Wallach's and VEBA's services under the 2014 Services Agreement. On information and belief, Wallach and VEBA hired Pinto under the 2014 Services Agreement.

38.    Benistar fully performed under the terms of the 2014 Services Agreement, including by paying Wallach and VEBA at least $61,000 between May 5, 2014 and June 3, 2015.

39.    Benistar also performed under the terms of the 2014 Services Agreement by paying directly to Pinto, pursuant to para. 2, p. 7 of the 2014 Services Agreement, at least $47,450 between May 5, 2014 and April 2, 2015.

40.    Notwithstanding the parties' execution of the 2014 Services Agreement, Wallach and VEBA defaulted within months on their obligations under the 2014 Services Agreement. Benistar cited, specifically, that there had been very limited or no perceptible change to the ongoing volume of disparaging information about Benistar being published and disseminated on the internet, and improper and unauthorized use of the BENISTAR Marks. Instead, Wallach and VEBA engaged in a rampant proliferation and pervasive existence of additional domain names personally registered by Wallach that were being directed to websites controlled by Wallach and VEBA, the websites prominently displaying the BENISTAR Marks and offering competing services.

41.    For example, Wallach personally and improperly registered over seventy (70) additional BENISTAR-formative domain names during the first year of the 2014 Services

Agreement term (April 14, 2014 to April 13, 2015), although he had no authority to do so from Benistar. (collectively, with the original Wallach-directed domain names, "Wallach's Benistar Domains").

42.     Among other things, the benistar.lawyer.com site directs the user immediately to www.lawyer.com, a site that calls itself a "lawyer matching service." Other uses of Benistar's name on sites include benistarlawuists.associates, benistarlawsuits.company, benistarlawsuites.expert, benistarlawsuits.reviews, benistarlawsuits.support. Benistar is not a law firm and does not hold itself out to be law firm or provide legal services. The registration of these domain names by Wallach is misleading to the public and damaging to Benistar.

43.     On information and belief, Wallach and VEBA also developed at least eight independent websites to which a substantial portion of Wallach's Benistar Domains resolved, the websites being dedicated to publishing and disseminating information about BENISTAR in an effort to attract Benistar customers to the competing business ventures of Wallach and VEBA.

44.     At least as early as 2015, approximately half of Wallach's Benistar Domains directly resolved to or were redirected to at least one of the eight different websites created by Wallach and VEBA ("Wallach's Benistar Websites") for the dual purpose of publishing and distributing information (often created by Defendants) that was disparaging of, and adverse to, the reputation of Benistar, and to attract Benistar customers to Wallach and VEBA. All of Wallach's Benistar Websites include the BENISTAR Marks prominently and repeatedly displayed as a trademark throughout the home landing pages and other pages of each site.

45.     Defendants have also undertaken a routine practice of creating and publishing via the internet and other media disparaging comments and accusations about Benistar owners, officers, and employees, including Trudeau and others.

46.     Defendants' acts described above in paragraphs 34-38 were in direct contravention of 2014 Services Agreement, including Sections 5, 9, and 10 of the constituting breach and thereby damaging Plaintiffs.

47.     On March 5, 2015, Benistar sent a formal Notice of Termination to Wallach and VEBA effectively terminating the 2014 Services Agreement in accordance with Section 8 thereof.

48.     On March 27, 2015, because Wallach and VEBA hired Pinto under the 2014 Services Agreement and Benistar was paying Pinto directly, Benistar sent a formal notice letter to Pinto effectively terminating immediately any and all agreements among Benistar and Pinto.

**E.     A 2015 Termination of Consulting Agreement and Release Among Benistar and Pinto; Pinto's Ongoing Breach and Failure to Perform**

49.     On May 21, 2015, in an effort to resolve differences with respect to the contractual obligations among Benistar and Pinto after termination of the 2014 Services Agreement, Benistar and Pinto executed a 2015 Termination of Consulting Agreement and Release on May 21, 2015.

50.     The 2015 Termination of Consulting Agreement and Release set forth Pinto's obligations with respect to treatment of Benistar's intellectual property rights (including the BENISTAR Marks) and information about Benistar being published and disseminated at Wallach's Websites. Specifically, applicable Sections of the 2014 Services Agreement provide:

4.     "Consultant represents and warrants that Consultant has no rights in Company's Intellectual Property Rights…"

5.     "Consultant shall not, under any circumstances or in any form of communication, whether published or unpublished, indicate any affiliation, connection, endorsement, or association with Company, nor shall Consultant, under any

circumstances or in any form of communication, whether published or unpublished, indicate sponsorship by the Company or approval of Consultant's performance of the Services or any actions or statements whatsoever of Consultant by Company."

6.     "Consultant shall not to use, write, or speak in any private, public, commercial, or electronic medium (including, but not limited to, any website) the name 'Benistar' or any derivative or any confusingly similar variation thereof whatsoever."

7.     "Within seven (7) business days from the Effective Date, Consultant shall transfer to Company all domain names owned by Consultant which include the name 'Benistar' or any derivative or any confusingly similar variation thereof whatsoever, the domain names to be transferred including but not limited to benistar.us…"

14.    "Except in a legal action as described in Section 13 above, neither Party shall make any negative statements in any form of communication, whether published or unpublished, concerning the other Party."

51.     On the one hand, Benistar fully performed under the terms of the 2015 Termination of Consulting Agreement and Release, including Section 3 thereof, by paying to Pinto $15,000 between June 26, 2015 and July 14, 2015.

52.     On the other hand, notwithstanding the aforementioned clarified obligations and any deadlines provided therewith, Pinto breached at least the aforementioned Sections of the 2015 Termination of Consulting Agreement and Release by way of the following non-limiting examples.

53.     Pinto breached Section 4 by not terminating and otherwise maintaining unlawful ownership of several BENISTAR-formative domain names.

54.     Pinto breached Sections 5 and 6 by not terminating and otherwise maintaining a prominent trademark usage of the BENISTAR Marks in at least a website to which Pinto's unlawfully owned domain name benistar.expert was directed.

55.     Pinto breached Section 7 by failing to transfer to Benistar within 7 days of the Effective Date any of the domain names subject to the 2014 Services Agreement, namely benistar.expert, benistar.healthcare, benistar.support, benistar.us, and benistarabuses.expert.

56.     Pinto breached Section 14 by virtue of disparaging remarks about Benistar provided at Pinto's benistar.expert website. Specifically, the website content asks, "Did Benistar….Cause You Harm or Get You Audited by the IRS?" and "Would you like to…Sue the &#@!...s [sic] who got you into this mess??"

**F.     A 2015 Termination of Agreement Letter Among Benistar and Wallach/VEBA; Wallach's and VEBA's Ongoing Breach and Failure to Perform the Termination of Agreement Letter**

57.     On October 9, 2015, in an effort to resolve differences with respect to the contractual obligations among Benistar and Wallach/VEBA after termination of the 2014 Services Agreement, Benistar and Wallach/VEBA executed a Termination of Agreement Letter.

58.     Wallach and VEBA executed the Termination of Agreement Letter and agreed to: (a) take any and all necessary steps with the appropriate registrar to effectuate the transfer of all domain names listed in Exhibit F (of the Letter) to Benistar within 14 days of the date of Wallach's receipt of the Notice of Termination; (b) never again register, control or renew any domain name bearing the BENISTAR Mark(s); (c) permanently discontinue any and all use of the BENISTAR Mark; and (d) remove or cause to be removed within 14 days any and all references to Benistar, from any print, website, or social media, owned or controlled by Wallach.

59.     Benistar fully performed under the terms of the Termination of Agreement Letter by paying to Wallach/VEBA $22,500 between October 9, 2015 and November 30, 2015.

60.     Wallach/VEBA did not perform and breached the Termination of Agreement Letter, by failing to comply with any of the above terms of the Termination of Agreement Letter.

61.     For example, Wallach is and remains the current registered owner of benistarproblems.com, which it was obligated to transfer to Benistar in accordance with the Termination of Agreement Letter.

62.     Specifically as well, Wallach has continued to register Benistar-formative domain names, such as benistarlawsuits.xyz created and registered by Wallach on April 13, 2017 in breach of the Termination of Agreement Letter.

63.     Further, and by way of specificity, Wallach and VEBA breached the Termination of Agreement Letter by continuing to create and perpetuate content that includes, references, and uses the BENISTAR Marks in print, websites, and social media outlets owned or controlled by Wallach or VEBA. On information and belief, such information is being disseminated by Wallach under his own name or one of his aliases, including Robert Sherman. Moreover, Wallach and VEBA are offering competing services under the Benistar Marks.

**G.     In 2017, Wallach's Defamatory *Per Se* Comments**

64.     On April 17, 2017, Wallach published a post to his LinkedIn account in which the title reads "don trudeau benistar jailtime for founder and lawsuits."

65.     This statement accusing Don Trudeau of criminal activity is untrue and in violation of New York law, and has damaged and will continue to damage Trudeau.

**H.     From 2011 to the Present, Defendants' Ongoing Cybersquatting and Trademark Infringement Activities**

66.     As alleged above, beginning at least as early as 2011, Wallach and VEBA began a concerted effort to register BENISTAR-formative domain names with a bad-faith intent to profit from the unlawful use of Benistar's BENISTAR Marks. The domain names have been registered for the purpose of publishing disparaging information about Benistar, trading on the goodwill of the BENISTAR Marks, and extorting vast sums of money from Benistar for the purchase of the domain names.

67.     For example, at least as recently as 2015 and during the term of the 2014 Services Agreement, Wallach's personal registration and ownership of BENISTAR-formative domain names ballooned from the half-dozen or so that he owned prior to into the Agreement to Wallach's 81 Benistar Domains.

68.     More than 50 of Wallach's 81 Benistar Domains were created and registered on March 11, 2015, less than one week after Benistar sent the Notice of Termination to Wallach for the 2014 Services Agreement.

69.     Wallach has transferred ownership of many of Wallach's 81 Benistar Domains to Pinto, who now owns at least 50 BENISTAR-formative domain names.

70.     It is currently estimated that Defendants collectively own at least 100 BENISTAR-formative domain names, whether registered under Wallach, VEBA, Pinto, aliases thereof, or anonymously.

71.     Over the past several years, Defendants have offered to sell their BENISTAR-formative domains to Benistar for amounts ranging from about $1,000 to about $10,000 per domain name. At other times, Defendants engaged in activity that purports to value several of their BENISTAR-formative domain names are worth hundreds of thousands of dollars.

72.     Specific examples of Defendants' assertion of value include:

(i)    In a January 22, 2016 email from Wallach to Trudeau, Pinto communicated an offer for sale to Benistar of six BENISTAR-formative domains for $10,000. Specifically, Wallach wrote to Trudeau, "[I]f you send Dathonie $10000 she will place the [six] sites listed in your possession."

(ii)    In a March 1, 2017 email from Wallach to Trudeau, Wallach wrote that "[Dathonie] showed me the 9000 bid for 1 benistar site and now she thinks she can get hundreds of thousands 4 her sites."

(iii)    In a March 9, 2017 email from Wallach to Trudeau, Wallach wrote that "[T]he site u mentioned…[benistar.sucks]…u maybe get 4 10 thousand. [Dathonie indicated] others maybe 1000 each…"

(iv)    In a March 16, 2017 email from Wallach to Trudeau, Wallach wrote that "Some of the [BENISTAR-formative] sites are valued at over $10,000," and "I will sell you the sites for $2000 each…There are about 80 sites." (In other words, Wallach made an offer to sell about 80 BENISTAR-formative domain names to Benistar for about $160,000.)

73.    On June 7, 2017, Trudeau received a solicitation from Wallach indicating a "Cyber Website Property Sale!" and offering "Benistar Web Sites For Sale!" for a "Package Deal #1" amount of $100,000.

74.    Such valuations of the BENISTAR-formative domain names are arbitrary, capricious, exorbitant, and far in excess of Defendants out-of-pocket expenses in obtaining the domains.

75.    Defendants continue the unlawful use of the BENISTAR Marks which are

confusingly similar BENISTAR-formative domains, as well as the unlawful use of the BENISTAR Marks at webpages and blogs established to advertise Wallach's and VEBA's services to the consuming public, wherein the services being offered under the BENISTAR Marks are in direct competition with services offered by Benistar and otherwise. Wallach and VEBA continue to trade on the goodwill of Benistar's BENISTAR Marks.

## I. Defendant's Harassment of Benistar, Including Individual Benistar Employees

76. Wallach and VEBA have broadened their campaign of harassment and disparagement by directly contacting Benistar and its employees, including by the direct emailing and communicating of the above-referenced solicitation flyer to Benistar employees.

77. In particular, Wallach's and VEBA's aggressive promotion of websites such as mollycarpenter.sucks to Benistar employees has created apprehension among Benistar employees with respect to the possibility that additional websites may be created by Wallach and VEBA for the purpose of harassing and casting specific additional Benistar employees in an unfavorable light. Consequently, such apprehension has had a marked negative effect on employee morale at Benistar.

## COUNT 1
### Federal Trademark Infringement and Unfair Competition Under the Lanham Act

78. Benistar incorporates by reference preceding paragraphs 1 through 77 of this Complaint as if fully restated herein.

79. Defendants' use of the BENISTAR Marks in commerce in connection with the sale, offer for sale, distribution, or advertising of services, is likely to cause confusion, or to

cause mistake, or to deceive the public.

80.     Defendants' conduct constitutes trademark infringement under 15 U.S.C. § 1114.

81.     Defendants' infringing acts were committed willfully and egregiously, with knowledge of Benistar's exclusive rights to and goodwill in its BENISTAR Marks, or with willful blindness to the same, and with the intent to cause confusion, or to cause mistake, and/or to deceive.  Thus, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

82.     Defendants' acts have diminished the goodwill enjoyed by Benistar with respect to the BENISTAR Marks. Defendants' conduct has caused damage to Benistar.

83.     As a result of Defendants' trademark infringement, Benistar has suffered and will continue to suffer substantial and irreparable injury, loss, and damages to its rights in and to its BENISTAR Marks and the goodwill associated therewith, for which Benistar has no adequate remedy at law.

84.     As the acts alleged herein constitute infringement of Benistar's BENISTAR Marks and as Benistar has no adequate remedy at law, Benistar is entitled to injunctive relief as well as monetary damages and other remedies as provided by 15 U.S.C. §§ 1116, 1117, and 1118, including recovery of Defendants' profits, all damages sustained by Benistar, treble those profits and damages, the cost of this action plus interest and including reasonable attorneys' fees, and other amounts yet to be determined.


## COUNT 2
## Federal Unfair Competition Under the Lanham Act

85.     Benistar incorporates by reference preceding paragraphs 1 through 84 of this Complaint as if fully restated here.

86.     Defendants' use of the BENISTAR Marks in commerce is a false designation of

origin, false or misleading description of fact, or a false or misleading representation of fact.

87.     Defendants' use of the BENISTAR Marks in commerce is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Benistar, or to the origin, sponsorship, or approval of Defendants' services by Benistar.

88.     Defendants' conduct violates 15 U.S.C. § 1125(a).

89.     Defendants' conduct has caused damage to Benistar.

90.     Defendants' conduct will cause further irreparable injury to Benistar if Defendants are not restrained by this Court from further violation of Benistar's rights.

91.     Defendants' infringing acts were committed willfully and egregiously, with knowledge of Benistar's exclusive rights to and goodwill in its BENISTAR Marks, or with willful blindness to the same, and with the intent to cause confusion, or to cause mistake, and/or to deceive. Thus, this is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

92.     As a result of Defendants' unfair competition, Benistar has suffered and will continue to suffer substantial and irreparable injury, loss, and damages to its rights in and to its BENISTAR Marks and the goodwill associated therewith, for which Benistar has no adequate remedy at law.

93.     As Benistar has no adequate remedy at law, Benistar is entitled to injunctive relief as well as monetary damages and other remedies as provided by 15 U.S.C. §§ 1116, 1117, and 1118, including recovery of Defendants' profits, all damages sustained by Benistar, treble those profits and damages, the cost of this action plus interest and including reasonable attorneys' fees, and other amounts yet to be determined.

## COUNT 3
### Federal Cybersquatting Under the Anticybersquatting Consumer Protection Act

94.     Benistar incorporates by reference preceding paragraphs 1 through 93 of this Complaint as if fully restated here.

95.     At least the following domain names registered to Defendants are confusingly similar to the BENISTAR Mark: benistar.associates; benistar.co; benistar.company; benistar.expert; benistar.financial; benistar.healthcare; benistar.lawyer; benistar.me; benistar.mobi; benistar.support; benistargroup.com; benistargroup.tax; benistargroupretiree.com; benistarhealth.com; benistarhealth.tax; benistarretiree.com; benistarretiree.tax; benistarretireehealth.com; benistarsolution.com; benistarsolution.tax; benistarsolutions.associates; benistarsolutions.company; benistarsolutions.expert; benistarsolutions.financial; benistarsolutions.healthcare; benistarsolutions.reviews; benistarsolutions.support; and benistarsolutions.tax.

96.     Defendants registered and Defendants use the above domain names with the bad faith intent of causing harm to Benistar and its brands and of profiting unlawfully from Benistar's trademark by using the BENISTAR Marks to call attention to and promote Defendants' business.

97.     Defendants registered and Defendants use the aforementioned domain names with the intent to divert consumers from Benistar's own website www.benistar.com to Wallach's Benistar Websites accessible through BENISTAR-formative domain names owned by Defendants, and with the bad faith intent to harm Benistar's goodwill and to profit from the BENISTAR Marks mark by creating a likelihood of confusion as to source, sponsorship, affiliation, or endorsement of Wallach's Benistar Websites and other internet media such as blogs.

98. Defendants have repeatedly offered to sell BENISTAR-formative domain names to Benistar for sums of money greater than Defendants' out-of-pocket expenses in obtaining the domain names.

99. Defendants are warehousing BENISTAR-formative domain names that are known to be confusingly similar to the BENISTAR Marks, which are distinctive well-known marks.

100. Defendants' actions constitute cybersquatting in violation of the Anticybersquatting Consumer Protection Act under 15 U.S.C. § 1125(d).

101. Defendants' infringing acts were committed willfully and egregiously, with knowledge of Benistar's exclusive rights to and goodwill in its BENISTAR Marks, or with willful blindness to the same, and with the intent to cause confusion, or to cause mistake, and/or to deceive. This is an exceptional case within the meaning of 15 U.S.C. § 1117(a).

102. Defendants' acts have diminished the goodwill enjoyed by Benistar with respect to its BENISTAR Marks. Defendants' conduct has caused damage to Benistar.

103. As a result of Defendants' cybersquatting, Benistar has suffered and will continue to suffer substantial and irreparable injury, loss, and damages to its rights in and to its BENISTAR Marks and the goodwill associated therewith, for which Benistar has no adequate remedy at law.

104. As the acts alleged herein constitute cybersquatting and infringement of Benistar's trademark under 15 U.S.C. § 1125(d), and as Benistar has no adequate remedy at law, Benistar is entitled to injunctive relief as well as monetary damages and other remedies as provided by 15 U.S.C. §§ 1116, 1117, and 1118, including recovery of Defendants' profits, all damages sustained by Benistar, treble those profits and damages, the cost of this action plus interest and including reasonable attorney's fees, and other amounts yet to be determined.

## COUNT 4
### New York State Common Law Trademark Infringement and Unfair Competition

105.    Benistar incorporates by reference preceding paragraphs 1 through 104 of this Complaint as if fully restated here.

106.    Defendants' acts constitute common law trademark infringement and unfair competition under the laws of the State of New York, and have created and will continue to create a likelihood of confusion to Benistar's irreparable harm unless restrained by this Court. Benistar has no adequate remedy at law for this injury.

107.    Defendants' acts have diminished the goodwill enjoyed by Benistar with respect to its BENISTAR Marks. Defendants' conduct has caused damage to Benistar.

108.    Defendants' acts demonstrate a bad faith, egregious, and willful intent to mislead, deceive, and confuse the public.

109.    Defendants' conduct is a violation of the common law prohibition against trademark infringement and unfair competition.

110.    As a result of Defendants' acts, Benistar is entitled to injunctive relief, an award of its actual damages, and an accounting of any profits enjoyed by Defendants as a result of their unlawful conduct. Further, in light of Defendants' bad faith, egregious, and willful intent to mislead, deceive, or confuse the public, and the need to deter Defendants from similar conduct in the future, Benistar is entitled to punitive damages.

## COUNT 5
### New York State Unfair Business Practice

111.    Benistar incorporates by reference preceding paragraphs 1 through 110 of this

Complaint as if fully restated here.

112.    Defendants' use of the BENISTAR Marks to promote, market, or sell products and services, including at Defendants' websites, constitutes a deceptive act or practice in the conduct of Defendants' business, trade, or commerce, and in the furnishing of services to consumers and is therefore a violation of N.Y. Gen. Bus. Law § 349 et seq.

113.    Defendants' materially misleading practice of using the BENISTAR Marks in Defendants' domain names and at its websites is likely to cause the consuming public at large to be misled as to the true source, sponsorship, or affiliation of the Defendants' services.

114.    As a result of Defendants' actions, Benistar has been damaged.

## COUNT 6
### Breach of Contract by All Defendants

115.    Benistar incorporates by reference preceding paragraphs 1 through 114 of this Complaint as if fully restated here.

116.    Benistar has performed its obligations under the Terms of the 2014 Services Agreement and/or were excused from performing under the Agreement.

117.    The conduct described herein constitutes breaches of the contractual obligations contained in the 2014 Services Agreement.

118.    As a result of Defendants' actions, Benistar suffered and is continuing to suffer irreparable injury, and has incurred and is continuing to incur monetary damage in an amount that has yet to be determined.

## COUNT 7
### Breach of Contract
### (Benistar v. Pinto only)

119.    Benistar incorporates by reference preceding paragraphs 1 through 118 of this Complaint as if fully restated here.

120.    Benistar has performed its obligations under the Terms of the 2015 Termination of Consulting Agreement and Release and/or were excused from performing under the Release.

121.    The conduct described herein constitutes breaches of the contractual obligations contained in the 2015 Termination of Consulting Agreement and Release and cited herein.

122.    As a result of Pinto's actions, Benistar suffered and is continuing to suffer irreparable injury, and has incurred and are continuing to incur monetary damage in an amount that has yet to be determined.

## COUNT 8
### Breach of Contract
### (Benistar v. Wallach/VEBA only)

123.    Benistar incorporates by reference preceding paragraphs 1 through 122 of this Complaint as if fully restated here.

124.    Benistar has performed its obligations under the Terms of the 2015 Termination of Agreement Letter and/or were excused from performing under the Letter.

125.    The conduct described herein constitutes breaches of the contractual obligations contained in the 2015 Termination of Agreement Letter and cited herein.

126.    As a result of Wallach's and VEBA's actions, Benistar suffered and is continuing to suffer irreparable injury, and has incurred and is continuing to incur monetary damage in an amount that has yet to be determined.

## COUNT 9
### Defamation *Per Se*
### (Trudeau v. Wallach only)

127.    Trudeau incorporates by reference preceding paragraphs 1 through 122 of this Complaint as if fully restated here.

128. On April 17, 2017, Wallach published a post to his LinkedIn account in which the title reads "don trudeau benistar jailtime for founder and lawsuits."

129. The above statements are false.

130. The above statements were published to third parties without privilege or authorization.

131. The above statements were published willfully and with malice in an attempt to harm Trudeau.

132. Trudeau was damaged and will continue to be damaged as a result of the publication.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that this Court enter judgment as follows:

A. In favor of Plaintiffs and against the Defendants on all claims for relief alleged in the Complaint and herein;

B. That the termination of the 2014 Services Agreement is ratified as of the effective date of the Notice of Termination, or as otherwise provided by law;

C. That Defendants and each of their respective agents, employees, servants, attorneys, successors and assigns, and all others in privity or acting in concert therewith, be preliminarily and permanently enjoined and restrained from:

   I. Any and all use of Benistar's BENISTAR Marks, or any confusingly similar designation alone or in connection with other words, as a trademark, service mark, trade name, trade name component, domain name (including any registration and/or ownership thereof), logo, or otherwise, to market, advertise, or identify goods or services;

II.     Any and all use of Benistar's BENISTAR Marks, or any version thereof, in connection with the description, marketing, promotion, advertising, or sale of any products or services, including at any website controlled by Defendants;

III.    Competing unfairly with Benistar or otherwise injuring Benistar's business reputation in the manner complained of herein;

IV.     Disparaging, harassing, providing unsolicited communications to, making any negative statements about, or creating any content whatsoever, as it relates to Benistar, or any of Benistar's shareholders, directors, officers, employees, products, or services, whether published or unpublished, in any media whatsoever whether in existence now or in the future, for all of eternity.

D.      That Defendants be directed to file with this Court and to serve on Benistar, within 30 days after the service of an order granting injunctive relief, a report in writing under oath, setting forth in detail the manner and form in which Defendants complied with the Court's injunction.

E.      That Defendants be directed to deliver up for destruction or other disposition by Benistar all products and all advertisements, price lists, product brochures, labels, signs, prints, decals, packages, boxes, cartons, wrappers, receptacles, and all other materials in Defendants' possession, custody, or control, which bear Benistar's BENISTAR Marks, pursuant to 15 U.S.C. § 1118.

F.      That Defendants be required to immediately transfer all domain names bearing the BENISTAR Marks, alone or in connection with any other words, owned by

Defendants to Benistar.

G.   That Defendants be required to pay all Benistar damages, including actual, direct, consequential, incidental, special, and otherwise sustained by Benistar as a result of Defendants' acts complained of herein, including, but not limited to, trademark infringement, unfair competition, cybersquatting, unfair business practices, and breach of the 2014 Services Agreement.

H.   That Wallach and VEBA be required to pay Benistar damages, both actual and compensatory, sustained by Benistar as a result of Wallach's and VEBA's acts complained of herein, including, but not limited to, trademark infringement, unfair competition, cybersquatting, unfair business practices, and breach of the 2015 Termination of Agreement Letter.

I.   That Pinto be required to pay Benistar damages, both actual and compensatory, sustained by Benistar as a result of Pinto's acts complained of herein, including, but not limited to, trademark infringement, unfair competition, cybersquatting, unfair business practices, and breach of the 2015 Termination of Consulting Agreement and Release.

J.   That Defendants be required to pay Benistar, as an alternative to actual damages and by Benistar's election, an award of statutory damages of not less than $1,000 and not more than $100,000 per domain name for each BENISTAR-formative domain name owned by Defendants, as the Court considers just, under 15 U.S.C. § 1117(d).

K.   That Wallach be required to pay compensatory and punitive damages to Trudeau for his willful and malicious publication of false statements.

L.   That damages sustained by Benistar as a result of Defendants' acts complained of herein, including, but not limited to, trademark infringement, cybersquatting, and unfair competition, be trebled pursuant to 15 U.S.C. § 1117.

M.   That Defendants be required to pay to Benistar the costs of this action, and in view of the exceptional nature of this case, Benistar's reasonable attorney's fees, pursuant to 15 U.S.C. § 1117.

N.   That Benistar be awarded such pre-judgment interest, as permitted by law.

O.   That Benistar be granted such other, different, and further relief as this Court deems just, equitable, and proper.

Dated: July 20, 2017

/s/ Steven M. Richman/
Steven M. Richman
CLARK HILL PLC
43 West 43rd Street, Suite 5
New York, New York 10036-7424
Phone: (212) 709-8084

210 Carnegie Center, Suite 102
Princeton, NJ 08540
Phone: (609) 785-2911
Email: srichman@clarkhill.com

*Counsel for Plaintiffs Benistar Admin Services, Inc. and Donald J. Trudeau*

## DEMAND FOR JURY TRIAL

Benistar hereby demands a trial by jury as to all issues so triable.

Dated:  July 20, 2017

*/s/ Steven M. Richman/*

Steven M. Richman
CLARK HILL PLC
43 West 43rd Street, Suite 5
New York, New York 10036-7424
Phone: (212) 709-8084

210 Carnegie Center, Suite 102
Princeton, NJ 08540
Phone: (609) 785-2911
Email: srichman@clarkhill.com

*Counsel for Plaintiffs Benistar Admin Services, Inc.
and Donald J. Trudeau*